IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

RODERICK L. SMITH,                    )
                                      )
        Petitioner,                   )
                                      )
vs.                                   )        Case No. CIV-14-579-R
                                      )
TERRY ROYAL, Warden,                  )
        Oklahoma State Penitentiary,  )
                                      )
        Respondent.[1]                )


## MEMORANDUM OPINION

Petitioner, Roderick L. Smith, a state court prisoner, has filed a Petition for a Writ

of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 18. This is Petitioner's

second habeas petition.

In 1994, in Oklahoma County District Court Case No. CF-1993-3968, Petitioner

was tried by jury for the murders of his wife and her four children. Petitioner was found

guilty and was sentenced to death on all five counts. In 1998, after an unsuccessful pursuit

for relief in the state courts, Petitioner initiated his first habeas corpus action, and in 2002,

the Court denied Petitioner relief. Smith v. Gibson, No. CIV-98-601-R (W.D. Okla. Jan.

10, 2002) (unpublished). Six months later, the Supreme Court held that the Eighth

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Terry Royal, who currently serves as warden of the Oklahoma
State Penitentiary, is hereby substituted as the proper party respondent.

Amendment prohibits the execution of a mentally retarded offender, <u>Atkins v. Virginia</u>, 536 U.S. 304, 321 (2002), and in March 2004,[2] Petitioner was given the opportunity to prove that he is mentally retarded.[3] A state court jury concluded that he is not (O.R. VI, 1115), and the Oklahoma Court of Criminal Appeals (hereinafter "OCCA") affirmed the jury's verdict. <u>Smith v. State</u>, No. O-2006-683 (Okla. Crim. App. Jan. 29, 2007) (unpublished). In July 2004, the Tenth Circuit affirmed this Court's denial of relief with respect to Petitioner's convictions, but found that Petitioner was entitled to a new sentencing proceeding due to ineffective assistance of counsel. <u>Smith v. Mullin</u>, 379 F.3d 919 (10th Cir. 2004).

In 2009, Petitioner had a jury trial to determine to his competence. Found competent (O.R. XII, 2276), Petitioner was then resentenced in 2010. This time around, the jury imposed two death sentences and three sentences of life without the possibility of parole (O.R. XIII, 2611-30). Petitioner appealed these sentences to the OCCA. The OCCA affirmed in a published opinion. <u>Smith v. State</u>, 306 P.3d 557 (Okla. Crim. App. 2013), <u>cert.</u> <u>denied</u>, 134 S. Ct. 2662 (2014). Petitioner was unsuccessful in his pursuit of post-

---

[2] This was actually Petitioner's second mental retardation trial. The first one, held in November 2003, ended in a mistrial (O.R. V, 993-98).

[3] In <u>Hall v. Florida</u>, 572 U.S. ___, 134 S. Ct. 1986, 1990 (2014), the Supreme Court began using the term "intellectual disability" instead of "mental retardation." Nonetheless, for purposes of simplicity and consistency, the Court will address Petitioner's claims utilizing the old terminology which was used throughout Petitioner's state court proceedings. <u>See</u> <u>Howell v. Trammell</u>, 728 F.3d 1202, 1206 n.1 (10th Cir. 2013); <u>Hooks v. Workman</u>, 689 F.3d 1148, 1159 n.1 (10th Cir. 2012).

conviction relief.  <u>Smith v. State</u>, No. PCD-2010-660 (Okla. Crim. App. Feb. 13, 2014) (unpublished).

Petitioner presents seven grounds for relief.  His first three grounds relate to the state court determination that he is not mentally retarded.  Ground Four is a challenge to the legal representation he received at his competency trial and resentencing.  In Grounds Five and Six, Petitioner argues that execution for his crimes would violate the Eighth Amendment's prohibition against cruel and unusual punishment.  His final ground alleges cumulative error.  Respondent has responded to the petition and Petitioner has replied.  Docs. 35 and 43.  In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing.  Docs. 20 and 38.  After a thorough review of the state court record (which Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth herein, Petitioner is not entitled to his requested relief.

## I.  Standard of Review.

### A.  Exhaustion as a Preliminary Consideration.

The exhaustion doctrine, a matter of comity which has long been a part of habeas corpus jurisprudence, requires the Court to consider in the first instance whether Petitioner has presented his grounds for relief to the OCCA.  As the Supreme Court stated in <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights."  The exhaustion doctrine is set forth in 28 U.S.C. § 2254(b).  Section 2254(b)(1)(A) *prohibits* the Court from *granting* habeas relief in the absence of exhaustion (although

Section 2254(b)(1)(B) sets forth two limited exceptions to this rule), but Section 2254(b)(2) *expressly authorizes* the Court to *deny* habeas relief "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.    Procedural Bar.

Beyond the issue of exhaustion, the Court must also examine how the OCCA adjudicated each of Petitioner's grounds for relief, i.e., whether the OCCA addressed the merits of Petitioner's grounds or declined to consider them based on a state procedural rule. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

### C.    Limited Merits Review.

When the OCCA has addressed the merits of one of Petitioner's grounds for relief, the Court reviews that ground in accordance with the standard of relief set forth in 28 U.S.C. § 2254(d). Pursuant to that section of the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), in order for Petitioner to obtain relief, he must show that the OCCA's adjudication of a claim either

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (acknowledging that "[t]he petitioner carries the burden of proof"). The very focus of this statutory provision is the reasonableness of the OCCA's decision. "The question under AEDPA is not whether a federal court believes the [OCCA's] determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007). In other words, "[i]t is not enough that [this] [C]ourt, in its independent review of the legal question, is left with a firm conviction that the [OCCA] was erroneous." What is required is a showing that the OCCA's decision is "objectively unreasonable." Lockyer v. Andrade, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

The Supreme Court has repeatedly acknowledged that Section 2254(d) "'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court[,]'" and that "[i]f [it] is difficult to meet, that is because it was meant to be." White v. Wheeler, 577 U.S. ___, 136 S. Ct. 456, 460 (2015) (quoting Burt v. Titlow, 571 U.S. ___, 134 S. Ct. 10, 16 (2013)); Harrington v. Richter, 562 U.S. 86, 102 (2011). Section 2254(d) "stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." Richter, 562 U.S. at 102. What remains, then, is a very narrow avenue for relief, one that permits relief only "*where there is no possibility* fairminded jurists could disagree that the [OCCA's] decision conflicts with [the Supreme] Court's precedents." Id. (emphasis added).

Section 2254(d) reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

Id. at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." Pinholster, 563 U.S. at 181.

## II. Analysis.

### A.    Ground One:    Sufficiency of the Evidence (Mental Retardation).

Petitioner's first ground for relief is an Atkins claim. He argues that because he is mentally retarded, his two death sentences cannot stand. The question of whether or not Petitioner is mentally retarded was submitted to a jury in 2004. The twelve-member jury listened to five days of testimony from twenty-three witnesses, ultimately concluding that Petitioner is not mentally retarded. On appeal to the OCCA, Petitioner challenged the jury's verdict, claiming it was contrary to the clear weight of the evidence. The OCCA denied relief on the merits. Smith, No. O-2006-683, slip op. at 6-11.

In denying Petitioner relief, the OCCA acknowledged that in mental retardation proceedings, Petitioner has the burden to prove by a preponderance of the evidence "'1) that he functions at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; 2) that his mental retardation manifested itself before

the age of 18; and 3) that he has significant limitations in adaptive functioning in at least two of the nine listed skill areas [communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work].'" Id. at 6 & n.8 (quoting Myers v. State, 130 P.3d 262 (Okla. Crim. App. 2005), for the definition of mental retardation developed by the OCCA in Murphy v. State, 54 P.3d 556, 567-68 (Okla. Crim. App. 2002)).[4]

"When a defendant challenges the sufficiency of the evidence following a jury verdict finding him not mentally retarded, [the OCCA] reviews the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion." Smith, No. O-2006-683, slip op. at 6. The Tenth Circuit has found this to be "the relevant constitutional standard." Hooks, 689 F.3d at 1166. "Put a different way, if any rational trier of fact could have found that [Petitioner] failed to establish, by a preponderance of the evidence, that he is mentally retarded, then the jury verdict must be upheld." Id. This is a mixed question of law and fact. Id. at 1165.

Although the standard of review applied to a jury verdict in a mental retardation proceeding is a modification of the standard set out in Jackson v. Virginia, 443 U.S. 307 (1979), the deference is the same: a jury verdict is given substantial deference. Because it is the jury's job "to resolve conflicts in the testimony, to weigh the evidence,

_____

[4] Before Oklahoma enacted Atkins legislation, the OCCA defined mental retardation and set forth the procedures for mental retardation proceedings in Murphy. Because Oklahoma's Atkins statute was not enacted until July 1, 2006, see Okla. Stat. tit. 21, § 701.10b, some two years after Petitioner's mental retardation trial, Petitioner's proceeding was governed by Murphy. See Hooks, 689 F.3d at 1165 & nn.4 & 5.

and to draw reasonable inferences from basic facts to ultimate facts[,]" its verdict will be "impinge[d] . . . only to the extent necessary to guarantee the fundamental protection of due process of law." Id. at 319. And, in the habeas context, "a second layer of deference" is added. This Court does "not directly review the jury's verdict[,]" but looks to the OCCA's resolution of the sufficiency claim to determine if "the OCCA correctly identified the governing legal principle from Jackson and reasonably applied it to the facts of [Petitioner's] case." Hooks, 689 F.3d at 1167. Therefore, in order to obtain relief, Petitioner must overcome these layers of deference and show that all fairminded jurists would agree that the OCCA "got it wrong." Lockett v. Trammel [sic], 711 F.3d 1218, 1231 (10th Cir. 2013). See also Frost v. Pryor, 749 F.3d 1212, 1225 (10th Cir. 2014) ("If . . . some fairminded jurists could possibly agree with the [OCCA's] decision, then it was not unreasonable and the writ should be denied.").

In reviewing the OCCA's resolution of this claim, the Court can only consider the evidence which the OCCA had before it. Pinholster, 563 U.S. at 181; Hooks, 689 F.3d at 1167. Because Petitioner's Ground One is a challenge to the jury's verdict, the evidence before the OCCA was the evidence that was presented to the jury. Despite these review parameters, Petitioner's argument for relief relies heavily on evidence which was not presented at his mental retardation trial. The Court will not consider this evidence.[5] The following is a summary of the trial evidence.

---

[5] In his reply, Petitioner states that with one exception (Attachment 5, Report of Dr. Terese Hall, dated September 12, 2005), all of his later developed evidence is simply "additional confirming evidence" which this Court can consider once it determines that he has satisfied Section 2254(d).

### Petitioner's Trial Evidence

Two experts, Dr. Clifford Alan Hopewell and Dr. Fred Smith, testified on Petitioner's behalf. Dr. Hopewell, a clinical neuropsychologist who had been involved in Petitioner's case since 1997, testified that in his opinion, Petitioner is "within the range of mild mental retardation" (Tr. 3/9/04, 30, 42, 46). Dr. Hopewell tested Petitioner's intelligence quotient (I.Q.) using the third revision of the Wechsler Adult Intelligence Scale (WAIS-III). Petitioner's full scale score was a 55, a score which reflected significantly sub-average intellectual functioning (id. at 55-56). Dr. Hopewell testified that this score substantially limits Petitioner's ability to understand and process information, to communicate, to learn from experiences or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others (id. at 57).

---

Reply at 1-3. This is incorrect. A jury verdict cannot be invalidated based on evidence which it did not hear. Matthews v. Workman, 577 F.3d 1175, 1185 (10th Cir. 2009) ("[I]t makes no sense for us, in reviewing whether a jury's verdict was based on sufficient evidence, to consider facts the jury never heard."). Although Petitioner asserts that Dr. Hall's report is an exception to Pinholster because it was presented to the OCCA in support of a trial counsel ineffectiveness claim, the fact remains that this Court cannot consider later developed evidence when evaluating the OCCA's determination of a sufficiency of the evidence claim. Hooks, 689 F.3d at 1168 n.7.

To assess Petitioner's adaptive functioning, Dr. Hopewell administered the Vineland Test[6] and the Wide Range Achievement Test (WRAT-III),[7] concluding that Petitioner has significant deficits in all areas (Tr. 3/9/04, 61, 65, 68, 130). Regarding communication, Dr. Hopewell found that Petitioner was "impoverished." While Petitioner could talk and communicate about basic things, Dr. Hopewell described Petitioner's communication skills as limited and lacking in both detail and spontaneity. He testified that Petitioner's communication was at an eight-year-old level (id. at 62-64). Regarding academics (as tested with the WRAT-III), Dr. Hopewell testified that Petitioner was at the kindergarten or first-grade level in spelling and writing (id. at 65-66). He also noted that Petitioner is functionally illiterate (id. at 66-67).

Dr. Hopewell testified that he had seen evidence that Petitioner had this condition before age 18 and that he did not believe that Petitioner was malingering or faking his condition (id. at 71, 73, 77).

---

[6] With the exception of communication, Dr. Hopewell gave only general testimony about the adaptive functioning he assessed with the Vineland. Although he testified that the Vineland tests five areas of adaptive functioning, he did not specify which ones, but simply stated that Petitioner tested out at an eight-year-old level on some things "like communication . . . and being able to do things and fix things and so forth" and at a five-year-old level "on a couple of things" (Tr. 3/9/04, 64). When asked if he believed that Petitioner had deficits in at least five of the areas of adaptive functioning, he responded that Petitioner had deficits in all of them (id. at 67-68). On cross-examination of Dr. John Call, defense counsel elicited the results of the Dr. Hopewell's Vineland testing in three primary areas: communication at four years, nine months; daily living skills at five years, eight months; and socialization at five years, eight months (Tr. 3/15/04, 49-51).

[7] Dr. Hopewell testified that the WRAT tests reading, writing, and math (Tr. 3/9/04, 65). Dr. Call testified that it tests reading, spelling, and math (Tr. 3/15/04, 27).

Dr. Smith, a psychologist with the Oklahoma Department of Corrections, testified about his evaluation and testing of Petitioner in 1997. On the Wechsler Adult Intelligence Scale–Revised (WAIS-R), Petitioner's full scale I.Q. score was a 65, and on the Standard Progressive Matrices, also known as the Raven's, Petitioner's I.Q. score was between 69 and 78. Dr. Smith testified that Petitioner's score on the WAIS-R was indicative of mental retardation (Tr. 3/10/04, 157-62). Although Dr. Smith believed that Petitioner was "a little bit brighter than what he tested out to be on the [WAIS-R]," he did not believe that Petitioner was faking. In his opinion, Petitioner "is consistent with mental retardation in his general level of functioning and speech" (id. at 163, 167-68). Noting that adaptive functioning is difficult to measure in a structured prison setting, Dr. Smith did not determine if Petitioner had any adaptive functioning deficits (id. at 164, 186-87). Ultimately, Dr. Smith testified that Petitioner was "right on [the] cusp" of being mentally retarded, but that he would "vote for mental retardation" (id. at 168).

Although all of Petitioner's school records except his high school transcript had been destroyed, school administrators and teachers testified that Petitioner was in special education classes beginning in elementary school (Tr. 3/9/04, 202-04; Tr. 3/10/04, 8-11, 14; Def.'s Exs. 1-3). Paul Preston, who taught high school special education, was Petitioner's teacher for four years. He described Petitioner as having very low/limited abilities. Although Petitioner received custodial training during high school, Mr. Preston testified that he would be surprised to learn that Petitioner worked as a janitorial supervisor because he did not believe that Petitioner had the skills for such a position (Tr. 3/10/04, 22, 28, 31, 43). Another special education teacher, Mona Autry, also had Petitioner as a

student.  She testified that Petitioner functioned in her classes at about a third grade level.
Although Petitioner tried hard, Ms. Autry testified that Petitioner was one of her lower
functioning students.  Like Mr. Preston, she testified that she would be "[e]xtremely
surprised" to learn that Petitioner was able to become a head janitor (id. at 94, 99-101, 104,
114).  Both Ms. Autry and Mr. Preston acknowledged Petitioner's very limited ability to
read (id. at 34, 100).

Madeline Corsoro was the music teacher at the elementary school where Petitioner
was employed as head custodian.  They worked together for about five years.  Petitioner
was responsible for cleaning her room and he also helped her with other things from time
to time.  Ms. Corsoro testified that through her interaction with Petitioner, she discovered
that he could not read (Tr. 3/10/04, 45-53; Def.'s Ex. 4).

Although witnesses testified that Petitioner was able to drive a car, Lee Frizzell, an
Oklahoma Department of Public Safety employee, testified that Petitioner did not have a
driver's license (Tr. 3/9/04, 112-14; Tr. 3/10/04, 63, 66, 75-76; Tr. 3/12/04, 41).

Petitioner's cousin, Chris Scott, testified that Petitioner was a loner, that he was
slower than everyone else, that he did not read, and that Petitioner's mother did everything
for him (Tr. 3/10/04, 69-71).  For about a year, Mr. Scott worked as a janitor with
Petitioner.  Mr. Scott testified that although Petitioner was his supervisor, Petitioner did
not perform supervisory duties.  Mr. Scott's mother, who hired Petitioner, handled the
paperwork, ordering, and time cards (id. at 71-74).

Jack Fisher, an attorney who had previously represented Petitioner, described
Petitioner "like an 11 or 12-year-old child" whose "main concern in life is that he have

pens and coloring books." Mr. Fisher identified a folder containing numerous coloring pages Petitioner had colored and sent to him. Mr. Fisher testified that he purchased coloring books for Petitioner and sent him money to buy felt pens at the prison commissary. Mr. Fisher did not bother sending Petitioner any books because Petitioner "can't read more than just maybe a few words." Mr. Fisher testified that Petitioner was not smart enough to make the decision to malinger (Tr. 3/10/04, 147-50, 151, 155; Def.'s Ex. 7).

Norman Cleary, who had shared a cell with Petitioner over the years, testified about his interaction with Petitioner in prison (Def.'s Ex. B at 4).[8] When Petitioner first moved into his cell, Mr. Cleary knew "within 30 minutes . . . that [Petitioner] had some problems" (id. at 5). He testified that Petitioner could not read or write, and although he tried to teach Petitioner to read, "it was hopeless" (id. at 5-6, 7, 9-11). Mr. Cleary testified that Petitioner would color in his coloring books and watch TV all day (id. at 7-8). Mr. Cleary helped Petitioner write and address letters and fill out his canteen slips (id. at 12-13, 15-16). Mr. Cleary testified that Petitioner could not tell time (except with a digital clock) or play simple games (except for Tic-Tac-Toe) (id. at 13-15, 29-30). When Petitioner would frequently cut himself and do nothing to address the bleeding, Mr. Cleary administered the first aid Petitioner needed (id. at 17-18). Mr. Cleary testified that other inmates took financial advantage of Petitioner (id. at 18-20).

---

[8] Because Mr. Cleary was scheduled to be executed on February 17, 2004, he gave videotaped testimony on February 4, 2004, and a transcript of his testimony was then read to the jury (O.R. V, 1013-19; Tr. 3/10/04, 196). The transcript was preserved for the record as Defendant's Exhibit B.

Petitioner's mother, Eva Cates, testified that Petitioner "was very, very slow" from the start. For him, walking, talking, and potty training were all delayed developments (Tr. 3/11/04, 5-7). Ms. Cates testified that other kids were cruel and would tease Petitioner because he acted like a two-year-old (id. at 7). Ms. Cates testified that she was told that Petitioner was placed in special education classes (id. at 8). She did not teach Petitioner to cook because she "didn't want him to play with fire when [she] wasn't there" (id. at 9).

## State's Trial Evidence

The State retained Dr. John Call, a forensic psychologist, to review Dr. Hopewell's opinion and conduct his own evaluation (Tr. 3/15/04, 3-7). It was Dr. Call's opinion that no reliable documentation existed to indicate that Petitioner was mentally retarded (id. at 39, 67).

Dr. Call disagreed with Dr. Hopewell's conclusion that Petitioner was not malingering. To determine if Petitioner was malingering, Dr. Hopewell administered two tests, the Test of Memory and Malingering (TOMM) and the 15-Item Memory Test. Petitioner's results on both of these tests showed that Petitioner was malingering; however, Dr. Hopewell discounted these results due to Petitioner's low score on the WAIS-III. Dr. Call testified that there was no research to support Dr. Hopewell's disregard for the malingering test results based on Petitioner's low I.Q. (id. at 12-22, 24-25, 37). When Dr. Call himself administered the WAIS-III and the TOMM to Petitioner, he received the same results as Dr. Hopewell; however, giving appropriate consideration to Petitioner's scores on the TOMM, Dr. Call testified that Petitioner's WAIS-III score must be deemed

invalid due to malingering. In sum, because there was evidence that Petitioner was malingering during both testing sessions, Dr. Call testified that neither his results nor Dr. Hopewell's results could be considered valid I.Q. assessments (id. at 25-26, 38-39, 69-70).

Dr. Call also took note of other I.Q. tests Petitioner had taken. In 1994, Petitioner received an I.Q. score of 73, and in 1997, he received a 70. Dr. Call testified that the drop from a 73 in 1994 to a 55 in 2003 was significant, and he explained how easy it would be to malinger on the WAIS test (Tr. 3/15/04, 34-38).

Dr. Call disagreed with Dr. Hopewell's use of the Vineland Test to assess Petitioner's adaptive functioning. Because Dr. Hopewell administered the test to Petitioner, and not to a third-party observer like a parent or a teacher as the Vineland was specifically designed, Dr. Call testified that Dr. Hopewell's assessment of adaptive functioning was also invalid. Acknowledging that adaptive functioning is extremely difficult to assess in a prison setting, as Dr. Smith likewise testified, Dr. Call did not do any formal adaptive functioning assessment of Petitioner. He did, however, testify that the Adaptive Behavior Assessment System, Second Edition (ABAS-II), could have been used. Based on his interviews with certain prison personnel and his own interaction with Petitioner, Dr. Call did not believe that Petitioner had any deficiencies in any particular area of adaptive functioning (id. at 22-25, 30-34, 48-49).

Like Dr. Hopewell, Dr. Call also gave Petitioner the WRAT-III. Although Dr. Call expected results similar to those received by Dr. Hopewell, the results were not the same. One major difference was in spelling. When Dr. Call administered the test, Petitioner could

not even spell his last name or recognize several additional letters – letters he was able to identify for Dr. Hopewell just eight months before.[9] After the State made reference to admitted exhibits wherein Petitioner had previously signed his name, Dr. Call testified that absent some significant brain damage since the time Petitioner had signed those documents (which there was no evidence of), it was clear to him that Petitioner was not putting forth his best effort (Tr. 3/9/04, 148; Tr. 3/15/04, 26-30, 70; State's Exs. 1-2, 5 and 6).

Ruby Badillo was an insurance agent who met with Petitioner and his wife about life insurance. Ms. Badillo testified that Petitioner "seemed perfectly normal" and "very sociable." Ms. Badillo stated that if Petitioner had had any kind of physical or mental challenge, she would not have been able to help him obtain a life insurance policy. After meeting with Petitioner for almost an hour, Ms. Badillo even asked Petitioner if he would be interested in working at her company selling insurance and other services (Tr. 3/11/04, 46-52; State's Ex. 6).

Emma Watts, Petitioner's case manager at the Oklahoma Department of Corrections, testified about her interaction with Petitioner over a two to three-year period. She described Petitioner as quiet and respectful (id. at 55-57). But for his cell change requests, which she felt were manipulative, she testified that Petitioner was no different from the other inmates (id. at 57, 61).

---

[9] Dr. Hopewell tested Petitioner in January 2003 and Dr. Call tested Petitioner in September 2003 (Tr. 3/9/04, 129; Tr. 3/15/04, 36, 44). Petitioner's reference in the petition to a December 2003 testing by Dr. Hopewell is incorrect. Pet. at 12.

Mark Woodward was Petitioner's supervisor at work in the months immediately preceding Petitioner's crimes. Mr. Woodward testified that as head custodian, Petitioner was the "go-to person if there was something that had to be done." Petitioner supervised four to five employees and did so adequately. No family members worked with Petitioner while Mr. Woodward was his supervisor (Tr. 3/11/04, 68-73). Mr. Woodward communicated with Petitioner through a pager, and Mr. Woodward testified that Petitioner knew how to operate the school's zoned alarm system (id. at 73-79). Mr. Woodward testified that Petitioner had access to carpet cleaners at the school and that from his review of crime scene photos, he could tell that the carpets had been cleaned by a cleaner similar to the ones at the school (id. at 79-81).

Fern Smith, one of the assistant district attorneys who originally prosecuted Petitioner, testified about her observations of him in 1993 and 1994. Ms. Smith, who has a Master's Degree in Special Education and previously taught high school special education before becoming an attorney, testified that she "didn't notice anything unusual or out of the ordinary during the times that [she] was in court with [Petitioner]." Ms. Smith told the jury that Petitioner filed and argued some of his own motions and that he was "articulate" and "knew what he was doing." Ms. Smith further testified that Petitioner "made good arguments" and "knew why he was presenting them."[10] Ms. Smith also testified that during his original trial Petitioner took notes and discussed the notes with his

---

[10] Even the Tenth Circuit noted that "[w]hile [Petitioner's] presentation did not reveal the skills of a trained legal mind, he put forth a coherent argument and demonstrated comprehension of both a lawyer's duties and the concept of a 'fair trial.'" Smith, 379 F.3d at 932.

attorney, which was very different from how Petitioner was currently acting in front of the jury. Based on her observations of Petitioner, Ms. Smith did not see anything that indicated he was mentally retarded (Tr. 3/11/04, 100-05, 111).[11]

Oklahoma City Police Officer John Maddox, who investigated the scene of Petitioner's crimes, testified that the crime scene had been altered after the crimes occurred (Tr. 3/11/04, 112-14). Some evidence was hidden in closets and under a bed, other evidence was concealed, and the title to Petitioner's car was found in the attic (id. at 114, 116). There was also evidence that the crime scene had been cleaned. After running some tests, the police determined that evidence had been removed from the carpet and from the kitchen and bathroom sinks (id. at 116-17). Officer Maddox testified that all of these actions were done to delay the investigation and did in fact do so, as Petitioner's crimes were not detected for some seven to ten days after their commission (id. at 116, 121-23).

Officer Maddox also testified about his interview of Petitioner on June 30, 1993. He testified that Petitioner understood his rights and answered some questions before pulling an attorney's business card out of his pocket and indicating that he did not want to talk anymore (id. at 117-19). He also testified how Petitioner was able to return a bicycle to a retail store and obtain a refund (id. at 119-20).

---

[11] In rebuttal, Kenneth Watson, Petitioner's original trial counsel, testified that Petitioner did not know what was going on, that he was unable to assist in his defense, and that Petitioner doodled on a pad of paper most of the time (Tr. 3/15/04, 72-73).

In the months before Petitioner's crimes, Petitioner was having an affair with Laura Dich.[12] Petitioner met Ms. Dich at a flea market. They exchanged phone numbers and began seeing each other the next day. Although Ms. Dich contacted Petitioner by pager and only met with Petitioner at certain times of the night, Ms. Dich had no idea that Petitioner was married and had kids. Ms. Dich saw Petitioner about four times a week and she considered him her boyfriend. Petitioner told her that he loved her and wanted to marry her and have kids with her. Petitioner maintained a sexual relationship with Ms. Dich and he rented a motel room for this specific purpose on more than one occasion. Ms. Dich testified that Petitioner acquired and paid for the motel room without her assistance (Tr. 3/12/04, 6-24, 26-27, 29).

Mariette Love, Petitioner's mother-in-law, testified that although she did not have a lot of contact with Petitioner, she did not believe he had anything wrong with him mentally. She did acknowledge, however, that Petitioner was a little slow, that "he didn't know what he should have known," and that she was not particularly happy with her daughter being in a relationship with him (id. at 32-34, 37-39).

Cherie Mishion, Petitioner's wife's niece, testified about the time she spent with Petitioner and his family. She told the jury about Petitioner's care of the kids and about how he would drive, read the paper, and cook breakfast. Petitioner even taught her how to drive. Ms. Mishion never had the impression that Petitioner was mentally handicapped or

_____

[12] Ms. Dich's prior testimony was read to the jury (Tr. 3/12/04, 4).

slow because he was no different than the rest of the family and was able to do what others could do (id. at 40-45).

Dina Dean was Petitioner's sister-in-law. Like Ms. Mishion, she testified about her familial relationship with Petitioner. She described Petitioner as "kind of stand-offish," but other than that he was normal. Because Ms. Dean had a younger sister who was "slow", she had a point of reference. She testified that in comparison to her sister, Petitioner was normal (id. at 47-51).

## OCCA's Decision

As noted above, in denying Petitioner relief on the sufficiency issue, the OCCA applied the correct constitutional standard. The question therefore is whether the OCCA applied it reasonably given the presented evidence. In upholding the jury's verdict, the OCCA analyzed the issue as follows:

> Evidence of [Petitioner's] intellectual functioning was controverted at trial by the experts.[FN9] [Petitioner's] primary expert, Dr. Clifford Hopewell, tested him in January 2003 and scored his full scale I.Q. at 55. Dr. Hopewell concluded that [Petitioner] is mildly mentally retarded and that he has adaptive functioning deficits in at least five areas. Dr. Frederick Smith, another psychologist who evaluated [Petitioner] in prison in 1997, testified that his testing showed that [Petitioner's] full scale I.Q. was 65, some ten points higher than Dr. Hopewell's score. Dr. Smith was left with the impression during his evaluation that [Petitioner] was actually brighter than what his I.Q. test score showed. He wrote in a memo shortly after the evaluation that he suspected that [Petitioner's] score was somewhat low in terms of accuracy. Dr. Smith also administered the Raven's Standard Progressive Matrices that showed [Petitioner] I.Q. was in the range of 69 to 78. He testified that he now believes [Petitioner's] I.Q. is closer to 70.

> FN9. Intelligence quotients are one of the many factors that may be considered, but are not alone determinative. Myers, 2005 OK CR 22, ¶ 8, 130 P.3d at 268.

The State presented the testimony of forensic psychologist Dr. John Call to refute [Petitioner's] expert evidence of subaverage intellectual functioning. Dr. Call gave [Petitioner] the Wechsler Adult Intelligence Scale-III (WAIS-III) I.Q. test and reviewed Dr. Hopewell's data and score on this same test, as well as several other tests. He found that [Petitioner] failed two tests designed to detect malingering given by Dr. Hopewell.[FN10] According to Dr. Call, [Petitioner's] performance on these two tests provides significant doubt about his efforts on the WAIS-III I.Q. test and the validity of Dr. Hopewell's overall testing. Dr. Call also gave [Petitioner] one of the malingering tests (Test of Memory and Malingering) during his evaluation and found that [Petitioner] failed again. Dr. Call concluded that [Petitioner's] score suggested a lack of effort on his part calling into doubt the reliability and validity of the I.Q. score that both he and Dr. Hopewell obtained.[FN11] Dr. Call noted a previous I.Q. test given by Dr. Murphy in 1994 in which [Petitioner] scored a full scale I.Q. of 73. Dr. Call believed lack of effort on [Petitioner's] part was one possible explanation to account for the discrepancy in the subsequent scores. In Dr. Call's opinion, the data showed that [Petitioner] did not put forth his best efforts during his and Dr. Hopewell's testing and that [Petitioner's] I.Q. test results were unreliable and suspect.

> FN10.  The tests were the 15-Item Test and the Test of Memory and Malingering commonly referred to as the TOMM test.

> FN11.  Dr. Call's I.Q. testing of [Petitioner] also showed a full scale I.Q. score of 55.

Though evidence of [Petitioner's] I.Q. was disputed, the State presented persuasive evidence from lay witnesses to refute [Petitioner's] evidence of subaverage intellectual functioning and of adaptive functioning deficits. Emma Watts, [Petitioner's] former case manager, now unit manager in prison, testified that she had daily contact with [Petitioner] for two years while acting as his case manager. Watts described [Petitioner] as quiet and respectful for the most part; he appeared to be like the other inmates in her unit. He was able to communicate with her and she found that he understood how to use manipulative behavior to get a more desirable cell or cellmate.

Ruby Badillo, a provider of financial services, testified that she met with [Petitioner] and his wife twelve years ago about purchasing life insurance. She recalled that [Petitioner] was kind and attentive to his wife. She identified their application and [Petitioner's] signature. She said that [Petitioner] neither indicated that he had any physical or mental challenges nor did she suspect that he had any based on their conversation. She described

[Petitioner] as "perfectly normal" and "very sociable." [Petitioner] appeared so personable and capable that Badillo tried to recruit him to work for her company selling insurance policies and presenting other financial services to would-be customers.

Mark Woodward, the facilities manager for a company providing custodial services to local schools, testified that [Petitioner] was the head custodian at Washington Irving Elementary School. Woodward described [Petitioner] as the "go-to" person if something needed to be done at the school. [Petitioner] was responsible for supervising a staff of four to five people working shifts from 7 a.m. until 11 p.m. and insuring that their time cards were filled out. [Petitioner] had to delegate custodial duties and, if someone was absent from work, reassign that person's duties. Woodward identified [Petitioner's] job application and signature; he also identified various forms that [Petitioner] had signed or filled out for his employment. He noted that [Petitioner] checked on his job application form that he could read, write and speak the English language. Woodward testified that he effectively communicated with [Petitioner] in person and through the use of a digital pager. He recalled an occasion when he had to reprimand [Petitioner] for not wearing his uniform and thereafter [Petitioner] followed the rules and wore his uniform. According to Woodward, [Petitioner] effectively operated the school's multi-zone alarm system and cleaning equipment. Woodward described [Petitioner] as a typical head janitor.

Fern Smith, one of the assistant district attorneys who prosecuted [Petitioner's] murder case, testified that [Petitioner] filed and presented several motions on his own behalf. She said that [Petitioner] was articulate and made "good" arguments to the court in support of his motions. She did not notice anything unusual or out of the ordinary about [Petitioner's] demeanor during trial or his many court appearances. She recalled him taking notes and conferring with counsel during trial. Ms. Smith, who was once a special education teacher of mentally retarded students, stated there was nothing in her contacts with [Petitioner] that led her to believe that [Petitioner] was mentally retarded.

Laura Dich testified that she met [Petitioner] in April 1993 at a flea market and they began dating shortly thereafter. [Petitioner] did not give her his home phone number, instead he had her use his digital pager number to contact him. [Petitioner] lied to Dich and told her that he lived with a cousin instead of with his wife and step-children and Dich claimed that she was none the wiser.[FN12] Dich testified that by the end of May 1993, her relationship with [Petitioner] was progressing and [Petitioner] told her that he wanted to marry and have children with her. Dich, who was only 19 years old and still

living with her parents, testified that [Petitioner] took her to a motel on several occasions and that it was [Petitioner] who rented and paid for the motel room.

> FN12.  Once when Dich paged [Petitioner], an upset woman returned the page causing Dich concern, but [Petitioner] convinced her for the most part that he had no other girlfriends.

> The evidence presented at trial supports a finding that [Petitioner] failed to meet even the first prong of the Murphy definition of mental retardation. The evidence, viewed in the light most favorable to the State, portrayed [Petitioner] as a person who is able to understand and process information, to communicate, to understand the reactions of others, to learn from experience or mistakes, and to engage in logical reasoning. He held down a job with supervisory functions, carried on an affair, argued motions on his own behalf and manipulated those around him. The jury's verdict finding that [Petitioner] is not mentally retarded is justified.

Smith, No. O-2006-683, slip op. at 7-11.

## Analysis

Petitioner asserts that the OCCA's decision is "patently unreasonable."  He claims that "the OCCA disregarded the clinical diagnostic practices and definitions of professionals in the field of intellectual disability by substituting its own I-know-it-when-I-see-it approach."  Characterizing the evidence as a "consensus of professionals in the field of intellectual disability," Petitioner additionally argues that the OCCA decision is inconsistent with expert opinion and with "the requirements of Atkins."  Pet. at 39-46.  In sum, he declares that "the OCCA arbitrarily relied on isolated factors that it unreasonably believed were inconsistent with intellectual disability while disregarding the wealth of evidence that shows [Petitioner] is intellectually disabled."  Reply at 5.  However, Petitioner's arguments for relief are extensively supported by evidence which the jury did not hear and which this Court cannot consider in deciding his claim.  Focusing on the

evidence presented at trial and the OCCA's review of that evidence, the issue of whether Petitioner is mentally retarded is not as clear cut as Petitioner alleges.

Although Petitioner claims that the OCCA violated <u>Atkins</u> by disregarding expert opinion, what the OCCA found was a dispute among the experts. Although Dr. Hopewell believed that Petitioner's I.Q. testing showed sub-average intellectual functioning, the State's expert, Dr. Call, questioned that conclusion based on additional testing that indicated Petitioner was not putting forth his best effort. <u>Smith</u>, No. O-2006-683, slip op. at 7-8. The same is true regarding Petitioner's adaptive functioning. While Dr. Hopewell found that Petitioner had deficits in all areas of adaptive functioning (Tr. 3/9/04, 63-65, 67-68), Dr. Call testified that Dr. Hopewell's assessment was invalid because the test was inappropriately administered (Tr. 3/15/04, 22-25). In addition, as with the testing of Petitioner's intellectual function, Dr. Call testified that he believed that Petitioner did not put forth his best effort in adaptive functioning testing. Dr. Call's opinion is supported by the fact that Petitioner could not even spell his last name for Dr. Call, when he had done so on prior occasions, including for Dr. Hopewell just eight months earlier (Tr. 3/9/04, 129, 148; Tr. 3/15/04, 26-30, 36, 44; State's Ex. 1).

Petitioner's assessment of the evidence also fails to give due consideration to the very posture of the claim. This is a sufficiency-of-the-evidence claim. Although Petitioner argues with great fervor that he is mentally retarded, that is not for this Court to decide. Petitioner had the opportunity to prove he is mentally retarded. However, a jury determined that he had failed to meet his burden of proof. That jury verdict, and its subsequent validation by the OCCA, is what is under review here, and the Court's review

is largely limited due to the deference afforded the jury's verdict and the AEDPA deference afforded the OCCA's decision.

While Petitioner clearly does not agree with the jury's verdict, it was the jury's job to assess the evidence, and the OCCA found that when viewing the evidence in light most favorable to the State, a rational trier of fact could have reached the same conclusion. In addition to Dr. Call's testimony, which called into question Petitioner's primary expert, evidence from lay witnesses showed that Petitioner had skills and strengths which the jury could consider in assessing whether Petitioner had significant limitations. See Smith, No. O-2006-683, slip op. at 11 ("[Petitioner] held down a job with supervisory functions, carried on an affair, argued motions on his own behalf and manipulated those around him."). Although Petitioner argues that his strengths were overemphasized and inappropriately considered, the Tenth Circuit has held that "[b]oth strengths and deficiencies enter into [the mental retardation determination] because they make up the universe of facts tending to establish that a defendant either has 'significant limitations' or does not. Not only does Murphy not require the OCCA to focus on deficiencies to the exclusion of strengths but—most relevant to our inquiry here—neither does Atkins." Hooks, 689 F.3d at 1172.

Given the evidence presented to the jury, the OCCA's assessment of that evidence in upholding the jury's verdict, and the double-deference review this Court must apply in its review, the Court concludes that Petitioner is not entitled to relief on his first ground for relief. Ground One is therefore denied.

**B.     Ground Two:       Challenges to the <u>Atkins</u> Trial.**

In his Ground Two, Petitioner cites irregularities in his mental retardation trial. He challenges the admission of evidence regarding his crimes, claims the prosecutors committed misconduct, and finds fault with a single instruction given to the jury.[13] The OCCA addressed all of these claims on the merits and denied relief. Smith, No. O-2006-683, slip op. at 3-5, 17-18. Applying AEDPA deference, the Court concludes that Petitioner is not entitled to relief.

Petitioner's first complaint concerns the testimony of Officer Maddox and the prosecution's reference to the same in closing argument. As detailed in Ground One, supra, Officer Maddox testified about how the crime scene had been altered. He discussed hidden evidence and indications that the crime scene had been cleaned. Officer Maddox also testified about his interview with Petitioner and Petitioner's ability during that interview to understand his legal rights. Petitioner asserts that the admission of this evidence was "especially egregious," "highly prejudicial," and "unquestionably vague and confusing." Pet. at 57, 60. He contends that this evidence was admitted in violation of the OCCA's decision in Lambert v. State, 71 P.3d 30, 31 (Okla. Crim. App. 2003), wherein the OCCA held that "[t]he jury should not hear evidence of the crimes for which [the defendant] was

_____

[13] Petitioner begins his Ground Two with a history/overview of mental retardation trials in Oklahoma in an effort to show that he never had a fair chance to receive a jury determination that he is mentally retarded. Pet. at 47-55. Within that discussion, Petitioner mentions, among other general complaints, the jury instruction defining the term mentally retarded, the prosecution's "novel interpretation" of the instruction, and an appeal that was "cramped," "abbreviated," and "clearly insufficient." The Court does not construe these references as additional grounds for relief and notes that while Respondent has specifically argued that the instruction and prosecutorial misconduct references are unexhausted claims, Petitioner has made no attempt to counter the argument.

convicted, unless particular facts of the case are relevant to the issue of mental retardation."

Petitioner additionally asserts that admission of this evidence "made it impossible to regard

the verdict as [] factually reliable . . . [as] required by Atkins."  Pet. at 60.

In denying Petitioner relief on this claim, the OCCA held as follows:

> [Petitioner] argues in his first proposition that the district court erred in allowing Detective Maddox to testify, over objection, that the concealing of evidence and altering of the crime scene were thoughtful, deliberate actions undertaken by [Petitioner] to avoid detection and which show that [Petitioner] is capable of logical reasoning. He maintains this testimony was beyond Detective Maddox's personal knowledge and is nothing but speculation.

> A trial court's decision to admit evidence will not be disturbed on appeal absent a showing of abuse of discretion accompanied by prejudice. Howell v. State, 2006 OK CR 28, ¶ 33, 138 P.3d 549, 561. Detective Maddox testified that he was the lead investigator in the crime for which [Petitioner] was convicted. He explained that evidence at the crime scene was hidden in closets and in the attic and that a bed had been "remade" in such a way as to conceal evidence hidden underneath it. He further explained that police determined that the carpet at the scene had been cleaned based on tracks in the carpet consistent with a carpet cleaning machine and tests confirming that evidence on the carpet had been removed through a cleaning process. The prosecutor asked Detective Maddox what the condition of the crime scene indicated to him about the mental ability of the perpetrator and Maddox testified that the placement of the evidence indicated the perpetrator thoughtfully hid evidence to avoid detection.

> The district court did not err in allowing this testimony. Jurors were told that [Petitioner] had been found guilty of a crime, but neither the crime itself nor the sentence imposed was revealed. Throughout the trial, no reference was made to the death penalty, capital punishment, or death row. No facts of the murders [Petitioner] committed were introduced and the district court confined the evidence to the narrow issue of mental retardation. [Petitioner's] ability to recognize the wrongfulness of his criminal acts and to conceal evidence of his crimes is relevant to the issue of whether he is capable of logical reasoning and whether he is mentally retarded. The evidence regarding the crime scene was presented without prejudicial details of the crime itself to comport with our prior decisions concerning admission of evidence related to the crime and admission of this evidence was not

unfairly prejudicial. <u>See</u> <u>e.g.</u>, <u>Lambert v. State</u>, 2003 OK CR 11, ¶ 3, 71 P.3d 30, 31. Maddox's opinion that [Petitioner] deliberately hid evidence to avoid being caught was rationally based on his perceptions of the crime scene and his dealings with [Petitioner] and were helpful to the jury's determination of whether [Petitioner] is mentally retarded. Such lay opinion testimony is admissible under 12 O.S.2001, § 2701. This claim is denied.

<u>Smith</u>, No. O-2006-683, slip op. at 3-4 (footnotes omitted).

This a state law evidentiary claim. Because this Court is only empowered "to vindicate [Petitioner's] constitutional rights," Petitioner "is entitled to relief only if [the] alleged state-law error [] was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." <u>Hooks</u>, 689 F.3d at 1180 (internal quotation marks and citation omitted). The Court concludes that relief is not warranted under this standard of review. Officer Maddox's testimony was presented in generic terms. The jury did not hear the gruesome details of Petitioner's crimes or how Petitioner's victims were discovered. <u>See</u> <u>Smith</u>, 379 F.3d at 923-34. The jury was not told that Petitioner's five victims were shoved into closets and under a bed and that the carpets and sinks had been cleaned to remove the evidence of blood. Instead the jury heard that the scene had been altered–that Petitioner had taken certain actions to cover up his crimes. The OCCA did not act unreasonably in determining that this evidence, and evidence of Petitioner's interaction with Officer Maddox, was relevant and admissible to the issue of Petitioner's mental abilities.

Petitioner's next complaint concerns five comments made by the prosecutors during voir dire, opening statement, and closing statement. Petitioner asserts that the comments were "misleading," "argumentative," "inaccurate," "[d]enigrating and disparaging," and

"deceptive." Pet. at 61, 62, 66. Alleging that the comments "thoroughly permeated the entire proceedings," he claims that he has been denied fundamental fairness and is entitled to relief. Reply at 17.

"Prosecutors are prohibited from violating fundamental principles of fairness, which are basic requirements of Due Process." Hanson v. Sherrod, 797 F.3d 810, 843 (10th Cir. 2015), cert. denied, 136 S. Ct. 2013 (2016). Therefore, when a petitioner alleges prosecutorial misconduct, the question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). Evaluating the alleged misconduct in light of the entire proceeding, the reviewing court must determine "whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006).

In denying Petitioner relief on this claim, the OCCA held as follows:

> [Petitioner] argues in his eighth proposition that he was denied a fair trial on the issue of mental retardation because of prosecutorial misconduct. Allegations of prosecutorial misconduct do not warrant reversal unless the cumulative effect of error found deprived the defendant of a fair trial. Warner v. State, 2006 OK CR 40, ¶ 197, 144 P.3d 838, 891.

> [Petitioner] challenges one of the prosecutor's statements during jury selection relating to the burden of proof, two statements in opening statement about the experts review of the evidence and three statements made during closing argument. The defense's objection to the prosecutor's question during jury selection about the burden of proof was sustained before any juror answered; the trial court advised the prosecutor to rephrase. We find the trial court's ruling cured any error in light of the instructions and other discussion about the burden of proof. McElmurry v. State, 2002 OK CR 40, ¶ 126, 60 P.3d 4, 30 (sustaining an objection generally cures any error.). The trial court also sustained the defense's objection to the first challenged remark during opening statement because it was argumentative and the

prosecutor followed the court's ruling and outlined the evidence. The second objection, for the same reason (argumentative), was properly overruled because the prosecutor was merely outlining the evidence. <u>Howell</u>, 2006 OK CR 28, ¶ 7, 138 P.3d at 556 (The purpose of opening statement is to tell the jury of the evidence the attorneys expect to present during trial and its scope is determined at the discretion of the trial court.). Likewise, any error in the prosecutor's statement during closing argument brought to the court's attention was cured when the trial court sustained [Petitioner's] objection. <u>McElmurry</u>, 2002 OK CR 40, ¶ 126, 60 P.3d at 30. The other two statements challenged in closing argument were not met with objection and a review of the remarks shows they were fair comments on the evidence. This claim is denied.

<u>Smith</u>, No. O-2006-683, slip op. at 17-18.

Although Petitioner argues that the OCCA gave this claim "short shrift," Pet. at 65, the Court finds that the OCCA's above analysis is both sufficient and reasonable under the AEDPA. The record reflects that with respect to the first three comments complained of by Petitioner, the trial court appropriately responded to Petitioner's objections. <u>See</u> <u>Le v. Mullin</u>, 311 F.3d 1002, 1013 (10th Cir. 2002) (a fundamental fairness assessment includes consideration of the trial court's "cautionary steps . . . to counteract improper remarks"). To the extent the question during voir dire was "probably a little on the edge," Petitioner objected to it at the onset before any harm could develop and the trial court directed the prosecutor to rephrase the question (Tr. 3/8/04, 155-56). Petitioner's objection to the opening statement comment was initially sustained as argumentative, but then overruled when the prosecutor rephrased the comment within acceptable parameters of outlining the evidence to the jury (Tr. 3/9/04, 22-23). And finally, when the prosecutor made the comment in closing argument that the defense "don't put in front of you what they don't want you to see," the trial court sustained the objection (Tr. 3/15/04, 103), thereby curing

any harm.  See Hanson, 797 F.3d at 845 n.13 (a sustained objection is presumed to cure any error).

As for the remaining two comments, both of which also occurred in closing argument, Petitioner made no objection to them at trial (Tr. 3/15/04, 95, 110-11).  See Le, 311 F.3d at 1013 (acknowledging that the absence of an objection is "relevant to a fundamental fairness assessment").  In the first of these comments, the prosecutor stated that Petitioner is "either a bottom dweller, slobbering, or he's just right on the cusp" (Tr. 3/15/04, 95).  Although referring to a person with mental retardation as a "slobbering bottom dweller" is harsh and inappropriate, the Court cannot conclude that this single reference rendered the entire proceeding fundamentally unfair.  The comment was not objected to, the prosecutor made the reference only once, and it was made within an otherwise permissible argument discussing Petitioner's expert evidence. As for the third unobjected-to comment, it concerned Officer Maddox's testimony, which the Court has already addressed herein.  Because the evidence was relevant and admissible, the prosecutor's reasonable comments based on the officer's testimony did not deny Petitioner due process.  See United States v. Dazey, 403 F.3d 1147, 1170 (10th Cir.2005) ("The prosecutor is entitled to argue to the jury that it should draw reasonable inferences from the evidence to support the government's theory of the case.").

Petitioner's final complaint concerns Jury Instruction No. 17 which required the jury to determine whether "the mental retardation [was] *present and known* before [Petitioner] was eighteen (18) years of age" (O.R. VI, 1138).  Petitioner contends that the language "present and known" is contrary to Atkins, which referred to mental retardation

manifesting itself (or the onset occurring) before the age of eighteen. <u>Atkins</u>, 536 U.S. at 308 n.3. Pet. at 70-71.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden." <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186 (10th Cir. 2002). "Unless the constitution mandates a jury instruction be given, a habeas petitioner must show that, in the context of the entire trial, the error in the instruction was so fundamentally unfair as to deny the petitioner due process." <u>Tiger v. Workman</u>, 445 F.3d 1265, 1267 (10th Cir. 2006).

In denying Petitioner relief on this claim, the OCCA relied on its prior decisions in <u>Howell v. State</u>, 138 P.3d 549 (Okla. Crim. App. 2006), and <u>Myers v. State</u>, 130 P.3d 262 (Okla. Crim. App. 2005). <u>Smith</u>, No. O-2006-683, slip op. at 5. In <u>Myers</u>, the OCCA held as follows:

> Jury instructions are sufficient if, when read as a whole, they state the applicable law. <u>McGregor v. State</u>, 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380. As used in this context, the word "manifest" is a transitive verb and the word "known" is an adjective. The *Random House Unabridged Dictionary* defines "known" as perceived or understood as fact or truth; apprehended clearly and with certainty. *See* "know" & "known" *Random House Dictionary* (2nd ed.1997). It defines "manifest" as "to make clear or evident to the eye or the understanding; show plainly ... to prove; put beyond doubt or question." *See* "manifest" *Random House Dictionary* (2nd ed.1997).

> We find that the words "present and known" are words of common everyday understanding that do not require a level of proof above that required to prove that a condition "manifested" itself. "Known" as it relates to the jury instruction used in this case does not require a scientific finding or a medical diagnosis. <u>See</u> <u>Murphy I</u>, 2002 OK CR 32, ¶ 31 n.19, 54 P.3d at 567 n.19. The retardation has only to have been perceived or recognized by someone before the defendant reached the age of 18. The court's instruction accurately stated the applicable law and therefore we find that the district court did not abuse its discretion in giving this uniform instruction.

<u>Myers</u>, 130 P.3d at 269.

Petitioner has not shown that the OCCA's analysis is unreasonable. In addition to the fact that Petitioner's claim has been specifically rejected in both <u>Howell v. Workman</u>, No. CIV-07-1008-D, 2011 WL 5143069, at *20-21 (W.D. Okla. Oct. 28, 2011) (unpublished), and <u>Myers v. Workman</u>, No. 02-CV-140-GKF-PJC, 2010 WL 2106456, at *57-59 (N.D. Okla. May 25, 2010) (unpublished), when the Court considers the additional step taken by the trial court to clarify this issue, Petitioner's argument is especially weak. Pulling clarifying language from the <u>Murphy</u> decision, <u>Murphy</u>, 54 P.3d at 567 n.19, the trial court further instructed the jury as follows:

> Whether mental retardation before the age of eighteen was present and known is a question of fact to be decided by you the jury. To establish that the first signs of mental retardation appeared and were recognized before [Petitioner] turned eighteen, lay opinion and poor school records may be considered.

(O.R. VI, 1140; Tr. 3/15/04, 75-77). Therefore, reviewing the instructions as a whole and giving the OCCA's decision appropriate deference, the Court finds that no relief is warranted on this claim.

In conclusion, for the reasons set forth above, the Court finds that Petitioner has not demonstrated his entitlement to relief for the claims raised in his Ground Two. Ground Two is therefore denied.

### C. Ground Three: Ineffective Assistance of <u>Atkins</u> Trial Counsel.

In his third ground for relief, Petitioner argues that his <u>Atkins</u> trial counsel was ineffective for two reasons. First, Petitioner faults his trial counsel for failing to retain and

present for testimony an expert like Theresa Flannery of the Dale Rogers Training Center.[14]

Petitioner contends that Ms. Flannery should have testified to educate the jury regarding his ability to work as a head custodian despite his limited intelligence.   Second, Petitioner asserts that his trial counsel should have retained an expert like Dr. Terese Hall to assess his adaptive functioning using the ABAS-II.  Because his expert at trial failed to use this test and was criticized by the State's expert for failing to do so, Petitioner asserts that Dr. Hall's results should have been presented to the jury to establish his significant limitations in adaptive functioning.   Had trial counsel presented these two pieces of additional evidence, Petitioner claims that he would not be under a death sentence today.

As an initial matter, the Court must first determine whether the OCCA's determination of these claims is entitled to AEDPA deference, a matter which the parties dispute. The record reflects that in his presentation of these ineffectiveness claims to the OCCA, Petitioner attached four exhibits to his application for relief, including an August 2006 affidavit from Ms. Flannery (Pet'r's Attach. 20), Dr. Hall's September 2005 report (Pet'r's Attach. 5), and a September 2006 affidavit from trial counsel (Pet'r's Attach. 15).  In denying Petitioner relief, the OCCA analyzed Petitioner's claims and discussed his extra-record material as follows:

> [Petitioner] contends in his ninth proposition that he was denied a fair trial because of ineffective assistance of counsel. He contends that trial counsel failed to investigate and fully present evidence demonstrating that

---

[14]  "Dale Rogers Training Center is the oldest and largest community vocational training and employment center in Oklahoma that serves persons with disabilities. . . . [It] provides individuals whose IQ levels test 75 or below with meaningful, productive, and compensated work."  Pet'r's Attach. 20 at 1.

he, in his status as a custodial supervisor, was working at his full potential as a person with mental retardation.

This Court reviews claims of ineffective assistance of counsel under the two-part <u>Strickland</u> test that requires an appellant to show: [1] that counsel's performance was constitutionally deficient; and [2] that counsel's performance prejudiced the defense, depriving the appellant of a fair trial with a reliable result. <u>Strickland v. Washington</u>, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); <u>Davis v. State</u>, 2005 OK CR 21, ¶ 7, 123 P.3d 243, 246. Under this test, [Petitioner] must affirmatively prove prejudice resulting from his attorney's actions. <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067; <u>Head v. State</u>, 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. "To accomplish this, it is not enough to show the failure had some conceivable effect on the outcome of the proceeding." <u>Head</u>, 2006 OK CR 44, ¶ 23, 146 P.3d at 1148. Rather, [Petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. <u>Id.</u> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

On appeal, [Petitioner] contends that trial counsel should have secured an expert in the field of training mentally retarded individuals to show that the skills he performed as head custodian were not inconsistent with someone who is mentally retarded. [Petitioner] has appended to his brief, among other things, an affidavit from Theresa Flannery who is the Administrator for the Dale Rogers Training Center's Vocational Programs, a vocational training program for mentally retarded individuals in Oklahoma City. She attests that individuals with an I.Q. in the range of 55 can be trained to be custodians, to set security alarms, to use pagers and to learn repetitive cleaning tasks.

We cannot consider [Petitioner's] extra record material to evaluate the merits of his ineffective assistance of counsel claim under these circumstances.[FN13] Convincing evidence was presented that [Petitioner] did not suffer from sub-average intellectual functioning that prevented him from being productive and able to function adequately. Those witnesses with first-hand knowledge of his skills portrayed [Petitioner] as capable and normal. This claim is denied.

FN13. [Petitioner] has not requested an evidentiary hearing on his ineffective assistance of counsel claim under Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2007). This Court does not consider *ex parte* affidavits and extra-record material for purposes of assessing the merits of an ineffective assistance of counsel claim. Rather, we will consider such material to

determine if an evidentiary hearing is warranted. <u>Dewberry v. State</u>, 1998 OK CR 10, ¶ 9, 954 P.2d 774, 776. Assuming [Petitioner] attached this information for purposes of requesting an evidentiary hearing on his ineffective assistance of counsel claim, the information is insufficient to show by clear and convincing evidence that there is a strong possibility that counsel was ineffective for failing to utilize the complained-of evidence. Rule 3.11(B)(3)(b)(i).

[Petitioner] contends in his tenth proposition that . . . his attorneys should have had an expert perform the ABAS II test to confirm deficits in his adaptive functioning.

[Petitioner] submits an affidavit from Dr. Terese Hall in support of this claim again without requesting an evidentiary hearing. We cannot consider this affidavit for purposes of evaluating the merits of this claim. Thus, we must find that [Petitioner] has failed to meet his burden and cannot prevail. This claim is denied.

<u>Smith</u>, No. O-2006-683, slip op. at 18-20. In a subsequent post-conviction proceeding, where Petitioner challenged his appellate counsel's handling of the extra-record materials, the OCCA explicitly stated that in its review of Petitioner's mental retardation trial, "[it] *did* consider the materials appended by MR appeal counsel, as if they had been properly presented under Rule 3.11." <u>Smith</u>, No. PCD-2010-660, slip op. at 7.[15]

Petitioner argues for de novo review based on the Tenth Circuit's decision in <u>Wilson v. Workman</u>, 577 F.3d 1284 (10th Cir. 2009) (en banc). Pet. at 85 n.53. In <u>Wilson</u>, 577 F.3d at 1300, the Tenth Circuit held that "[w]hen the OCCA, pursuant to Rule 3.11, refuses

---

[15] Although Petitioner faults his appellate counsel for not following proper Rule 3.11 procedure, Pet. at 83, the Court does not construe this one-sentence declaration as an additional claim of ineffectiveness. In any event, such a claim would be unworthy of habeas relief. Because the OCCA considered the materials as if they had been properly filed under Rule 3.11, it was reasonable for the OCCA to deny Petitioner relief on his appellate counsel claim due to the absence of prejudice. <u>Smith</u>, No. PCD-2010-660, slip op. at 7.

to grant an evidentiary hearing to consider material, non-record evidence of ineffective assistance of counsel that the defendant has diligently sought to develop, and then rules on the ineffectiveness claim without consideration of this evidence, the OCCA's denial of the claim is not an adjudication on the merits to which the federal courts owe AEDPA deference." Petitioner stands on Wilson, despite the Tenth Circuit's subsequent holding in Lott v. Trammell, 705 F.3d 1167 (10th Cir. 2013). In Lott, the Tenth Circuit (1) acknowledged the OCCA's post-Wilson decision in Simpson v. State, 230 P.3d 888, 906 (Okla. Crim. App. 2010), wherein the OCCA explained the relationship between the Strickland standard and the Rule 3.11 standard a defendant must meet in order to obtain an evidentiary hearing in state court on his ineffectiveness claim; (2) reversed the position it took in Wilson; and (3) concluded, in light of Simpson, that when the OCCA applies Rule 3.11 to deny a defendant an evidentiary hearing, the same constitutes a merits ruling entitled to AEDPA deference. Lott, 705 F.3d at 1211-13. See Glossip v. Trammell, 530 F. App'x 708, 736 (10th Cir. 2013) (acknowledging that Wilson is "no longer good law given the OCCA's subsequent decision in Simpson"). Thus, contrary to Petitioner's assertion, Lott is controlling and the OCCA's decision on Petitioner's claims concerning Ms. Flannery and Dr. Hall is due AEDPA deference.

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Burt v. Titlow, 571 U.S.___, 134 S. Ct. 10, 18 (2013). Whether counsel has provided constitutional assistance is a question to be reviewed under the familiar standard set forth in Strickland v. Washington, 466 U.S. 668 (1984). To obtain relief, Strickland requires a defendant to show not only that his counsel

performed deficiently, but that he was prejudiced by it. Id. at 687. A defendant must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. The assessment of counsel's conduct is "highly deferential," and a defendant must overcome the strong presumption that counsel's actions constituted "'sound trial strategy.'" Id. at 689 (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690.

As Strickland cautions, "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id. at 689. Therefore, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. Within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Id.

As for prejudice, Strickland requires a defendant to show that his counsel's errors and omissions resulted in actual prejudice to him. Id. at 687. In order to make a threshold showing of actual prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

In Richter, the Supreme Court addressed the limitations of the AEDPA as specifically applied to a claim of ineffective assistance of counsel that a state court has denied on the merits.  The Court held that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Richter, 562 U.S. at 101 (internal quotation marks and citation omitted).  The Court bluntly acknowledged that "[i]f this standard is difficult to meet, that is because it was meant to be." Id. at 102.

> [The AEDPA] preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no further. Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal.

Id. at 102-03 (internal quotation marks and citation omitted).  When these limits imposed by the AEDPA intersect with the deference afforded counsel under Strickland, a petitioner's ability to obtain federal habeas relief is even more limited.

> Surmounting Strickland's high bar is never an easy task. An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the Strickland standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve.  Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing

professional norms, not whether it deviated from best practices or most common custom.

Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so[.] The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Richter, 562 U.S. at 105 (internal quotation marks and citations omitted).

In disposing of Petitioner's claims, the OCCA applied Strickland. The question, therefore, is whether it applied Strickland in a reasonable manner. Although Petitioner characterizes the OCCA's analysis as "unclear," Pet. at 85, not knowing whether the OCCA denied Petitioner relief under the deficient performance prong, the prejudice prong, or both, does not make its decision unreasonable. Williams v. Trammell, 782 F.3d 1184, 1199 (10th Cir. 2015) ("[U]ncertainty does not change our deference."). It is the result, not the analysis, which is paramount to this Court's review. Lack of clarity is "not a license to penalize a state court for its opinion-writing technique." Lafler v. Cooper, 566 U.S. 156, 183 (2012). "Even '[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.'" Williams, 782 F.3d at 1199-1200 (citation omitted). Here then, this Court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible

fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." Richter, 562 U.S. at 102.

### Theresa Flannery

Petitioner asserts that Ms. Flannery's testimony about the abilities of an individual with an I.Q. between 50 and 70 could have undercut the State's evidence and argument that "someone with [an] intellectual disability surely could not carry out the duties required" by Petitioner's position as head custodian at an elementary school. Pet. at 77. Regarding the State's evidence and related argument, Petitioner points to the State's opening statement wherein the prosecutor commented on Petitioner's competence as a head custodian (Tr. 3/9/04, 27-28); the prosecutor's elicitation of testimony from Petitioner's former teachers that they would be surprised if Petitioner could hold such a position (Tr. 3/10/04, 43, 114); Dr. Call's testimony "that there would be some significant problems" with Petitioner having such a job (Tr. 3/15/04, 68); and the State's closing argument references to his teachers' surprise (id. at 93, 104-07). Pet. at 77-78.[16] Petitioner contends that his trial counsel's failure to seek out Ms. Flannery is made worse by the fact that after his first mental retardation trial (which ended in a mistrial), trial counsel knew that the prosecution would employ this strategy. From his first trial, Petitioner points to similar testimony from one of his teachers about his surprise (Tr. 11/18/03, 235) and testimony from a cousin/coworker who testified that Petitioner was his supervisor and had keys to the alarm-protected school building (Tr. 11/19/03, 16-17, 19, 21). Pet. at 78.

---

[16] In his reply, Petitioner also points to the testimony of Mr. Woodward, a State's witness. Reply at 19. As detailed in Ground One, supra, Mr. Woodward was Petitioner's supervisor. He testified that Petitioner supervised four to five employees, communicated with him through a pager, and knew how to operate the school's alarm system.

The OCCA's denial of relief on this claim is not unreasonable under either Strickland prong. From Petitioner's argument, one might get the impression that trial counsel did absolutely nothing to counter this evidence. This is simply not the case. Trial counsel elicited evidence from its expert, Dr. Hopewell, that being in a supervisory position is not inconsistent with being mentally retarded (Tr. 3/9/04, 69). Dr. Hopewell described Petitioner's job as "routine," and while acknowledging that Petitioner had some people who reported to him, he testified that Petitioner's supervisory responsibilities were limited to making sure that the cleaning assignments of absent employees got done (Id. at 116). Petitioner's cousin, who worked with Petitioner at the school for a time, also testified that Petitioner's supervisory duties were limited: "He just made sure everybody did what we had to do. If one of us didn't come in, he would just have to do the work. That was it" (Tr. 3/10/04, 72). His cousin further testified that it was his mother, Petitioner's aunt, who hired Petitioner and did all the paperwork required. Petitioner did not have to complete any paperwork in his supervisory duties (id. at 73-74). Finally, through the testimony of one of Petitioner's former teachers, the jury learned that Petitioner had participated in a work-study program where he received specific training to be a school janitor (id. at 31).

Trial counsel offered and the court admitted into evidence Petitioner's work schedule. It listed Petitioner's area of responsibility; daily, weekly, and as needed assignments; and the full cleaning schedule. Although it classified Petitioner as "Head Custodian," no supervisory duties were noted (Def.'s Ex. 4). When trial counsel showed this schedule to one of Petitioner's former teachers who had testified that she would be "[e]xtremely surprised" to know that Petitioner was working as a head janitor, she testified

that she would not be surprised if Petitioner could carry out those general cleaning duties. She only questioned whether he *might* have issues reading the names of the chemicals and/or knowing which chemicals to use (Tr. 3/10/04, 114-15).

In response to testimony from Mr. Woodward, see n.16, supra, trial counsel brought out on cross-examination that he had only been Petitioner's supervisor for "a very short time," and that although Mr. Woodward had testified that Petitioner was responsible for making sure everyone's time cards were filled out, he admitted on cross-examination that he only came by the school to pick up the time cards from Petitioner and had no idea what, if anything, Petitioner had done to make sure they were ready to go (Tr. 3/11/04, 92, 94, 97). And in closing argument, trial counsel made the following comments about Petitioner's job:

> As an adult [Petitioner] became a janitor. And you will have the job description of that position. Now, it was called head janitor. But I ask you to look over that description. And what you will see is he cleaned, he straightened, he threw away trash, very simple tasks. The title of head janitor did not mean he was responsible for major supervisory responsibilities.
>
> In fact, Mr. Woodward, who was his supervisor for the last six to seven weeks of his employment, indicated that the biggest thing that the head janitor did was if someone didn't show up he was supposed to delegate the duties of the person that didn't show up. However, if you will remember Chris Scott's testimony, he didn't delegate those responsibilities. [Petitioner] would do the job - - the cleaning job of the person who missed work.
>
> In addition to those duties, the state has argued that there was paperwork involved in this. However, Mr. Woodward also indicated there was a limited amount of paperwork that [Petitioner] was responsible for. And Mr. Scott told us that his mother was the one who assisted [Petitioner] with his paperwork.
>
> . . . .

The evidence that he had the janitor job. All the experts testified, including the Special Education teachers, including Fern Smith, the prosecutor in this case, testified that mentally retarded people can have jobs. They can work. I bet we shouldn't be surprised by that, should we, that mentally retarded people can have jobs? It's what kind of jobs they have and what kind of work that they can get. And Mr. Preston testified through the transcript that janitorial work is the kind of work that they were teaching children for in high school in the work co-op class to teach them how to be functional in society.

The fact that he was able to have a job doesn't mean he's not mentally retarded.

(Tr. 3/15/04, 82-83, 120).

In light of what trial counsel did do, trial counsel was not deficient with respect to the Flannery evidence. At most, Petitioner has shown that there was some additional evidence that trial counsel could have been presented to challenge the State's assertions about his job and its reflection of his mental capabilities. While Ms. Flannery's testimony may have bolstered trial counsel's efforts, there is always more that counsel could have done, but failing to pursue any and all evidentiary angles does not make counsel ineffective. As noted above, within "the wide range of reasonable professional assistance," "[t]here are countless ways to provide effective assistance in any given case[, and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689.

There is no Strickland prejudice as well. Even if the Flannery evidence had been presented, there is no reasonable probability that Petitioner would have received a jury verdict that he is mentally retarded. The janitor evidence was just a part of the evidence before the jury, and given trial counsel's efforts to challenge the State's contentions about

the significance of his job, as well as all of the other evidence presented, Petitioner was not prejudiced by its absence.

## Dr. Terese Hall

Because trial counsel was aware that Dr. Call would criticize Dr. Hopewell's use of the Vineland Test to test Petitioner's adaptive functioning, Petitioner contends that trial counsel was ineffective for failing to retain an expert like Dr. Hall to assess his adaptive functioning using the ABAS-II. On the ABAS-II, administered by Dr. Hall in 2005, Petitioner scored "in the significantly impaired range in several areas . . . ." Pet'r's Attach. 5 at 12. Because trial counsel did not have Petitioner tested using the ABAS-II, Petitioner asserts that his case "was left vulnerable to damaging attacks by the prosecution" and a "critical requirement for a finding of mental retardation was left in question." Pet. at 82, 83. Here again, however, the Court cannot conclude that the OCCA was unreasonable to deny Petitioner relief on this claim.

Regarding the Vineland Test, Dr. Hopewell testified that although it is usually administered to a caretaker, he administered it directly to Petitioner. He explained that given Petitioner's status as a prisoner, he did not have caretakers to interview in the traditional sense. While guards looked after Petitioner, Petitioner was housed in a cell and did not have frequent contact with them. Dr. Hopewell called it an "artificial setting." For example, Petitioner was not in a situation where others could assess his ability to cook a meal because cooking a meal in that setting was impossible. In Dr. Hopewell's opinion, "it was really much better just to get the information directly from [Petitioner], as well as what [he (Dr. Hopewell)] was seeing in [his] testing and then the information from the

other records that [he] had" (Tr. 3/9/04, 60-62).  Dr. Hopewell testified that the Vineland tests five areas of adaptive functioning, and although he did not detail each of the five areas tested, he did testify that Petitioner had deficits in all areas (id. at 64, 65, 68).

On cross-examination, the State did question Dr. Hopewell rather extensively about his use of the Vineland Test.  Dr. Hopewell defended his use of the test and explained that he did not give the test to Petitioner's mother or a former teacher because Petitioner was an adult who had not lived with his mother for a number of years and relying on a teacher's memory from that long ago would have been inappropriate (id. at 143-45).   When questioned about whether the Vineland results may have been skewed due to Petitioner's failure to be truthful about his abilities, Dr. Hopewell acknowledged that if Petitioner had lied consistently, it could have changed some scores on the test; however, the Vineland results were just a part of the information he relied on to assess Petitioner's adaptive functioning. Beyond the Vineland, Dr. Hopewell relied on Petitioner's extensive records, his own personal observation of him, and discussions he had with Petitioner's nurse, prison guards, and attorneys (id. at 151-52, 154).

On redirect, Dr. Hopewell testified that no adaptive functioning test, including the ABAS-II, has been designed for the prison population.  He also explained that the ABAS-II was new and that using it required caution.  Even though the test had norms, "it's so new that still people don't know how to do on it."  Dr. Hopewell testified that the Vineland was the most familiar test (one of the reasons why he chose it):

> [I]f I reported tests that other people are familiar with and aware of they can
> at least make some comparisons.  So if I use a test that's brand new or other
> people aren't aware of that creates some problems.  So I just felt it was quite

- - I thought it was quite adequate to and saw no reason not to [use the Vineland].

Dr. Hopewell further testified that although the Vineland was "an entirely appropriate or adequate measure to give," Petitioner's adaptive functioning deficits were so profound that his choice of test was of little or no consequence (Tr. 3/9/04, 190-91).

Dr. Call testified that Dr. Hopewell should not have used the Vineland because it was not designed to be given to the subject of the study, and because Dr. Hopewell gave the test to Petitioner, the results were of no value (Tr. 3/15/04, 22-25). He, however, did not do any adaptive functioning testing of Petitioner (id. at 45-46). Dr. Call interviewed a prison psychologist and a guard, but was "unable to use a standardized instrument with them" (id. at 31). He discussed Petitioner's ability to communicate with him, but he again "underline[d]" the fact that he "was unable to give any individual standardized technique" (id. at 32). Although Dr. Call admitted that it was difficult to measure adaptive functioning in the structured prison setting and agreed with Dr. Hopewell that there is no adaptive functioning test specifically designed for the prison population, he suggested that the ABAS-II could have been used (id. at 34, 48-49).

Like the Flannery evidence, the OCCA's determination that trial counsel was not ineffective with respect to the Hall evidence is also not unreasonable. While trial counsel was aware that Dr. Call would criticize Dr. Hopewell's use of the Vineland test, it was not unreasonable for counsel to forego additional testing. The evidence presented at trial showed that there was no standardized test to assess the adaptive functioning of prisoners. Dr. Hopewell not only had a reasonable explanation for using the Vineland, but also

explained that it was not the only information he used to assess Petitioner's adaptive functioning. And while Dr. Call criticized Dr. Hopewell's use of the Vineland, he did no testing of his own, but only suggested that the ABAS-II may have been used. Here again, Dr. Hall's additional testing may have aided Petitioner's case, but trial counsel was not deficient for relying on Dr. Hopewell alone. Assessing trial counsel's actions requires a deferential lens. Through this lens, trial counsel's actions were not unreasonable.

As for prejudice, even if trial counsel had presented Dr. Hall's ABAS-II results, no reasonable probability exists that the jury would have found Petitioner to be mentally retarded. Although Petitioner asserts that Dr. Call's discounting of Dr. Hopewell's Vineland results left a devastating void in his case, his assertion ignores (1) Dr. Hopewell's testimony that the Vineland was just a part of his total assessment of Petitioner's adaptive functioning; (2) the additional testimony Dr. Hopewell gave (apart from the Vineland) about Petitioner's adaptive functioning deficits in the areas of communication and academics (O.R. VI, 1138-39; Tr. 3/9/04, 62-63, 65-67);[17] and (3) all of the additional evidence which was presented at trial regarding Petitioner's skills. Considering all of this evidence, <u>Strickland</u> prejudice is lacking.

---

[17] The jury was only required to find significant limitations in two of nine skill areas.

In conclusion, for the reasons set forth above, the Court concludes that Petitioner has failed to demonstrate that the OCCA was unreasonable in its denial of relief on these two claims of trial counsel ineffectiveness.[18] Ground Three is therefore denied.

**D.    Ground Four:    Ineffective Assistance of Trial and Appellate Counsel (Competency and Resentencing).**

Petitioner's Ground Four is another challenge to the effectiveness of his counsel. Here, however, Petitioner challenges the representation he received during his 2009 competency trial and 2010 resentencing. Petitioner asserts that his trial counsel in these proceedings was ineffective for failing to present a witness, Anna Wright, and a DVD of Petitioner which she could have sponsored for admission. Petitioner additionally contends that his appellate counsel was ineffective for failing to raise this trial counsel ineffectiveness claim on appeal. These claims were presented to the OCCA on post-conviction. The OCCA denied relief on the merits. Smith, No. PCD-2010-660, slip op. at 9-10. Because Petitioner has not shown that the OCCA was unreasonable in its denial, his Ground Four must be denied.[19]

Petitioner asserts that Ms. Wright could "have presented compelling and incisive testimony about [his] simple and childlike nature as observed by her in her capacity as a

---

[18] Petitioner's assertion that the OCCA's decision is unreasonable because it did not consider both failures by trial counsel in a Strickland prejudice analysis is unavailing because for the reasons set forth herein, neither failure by counsel was deficient. Pet. at 85-86.

[19] Having concluded herein that the OCCA did not unreasonably deny relief on Petitioner's trial counsel claim, the OCCA's determination of Petitioner's appellate counsel claim was likewise reasonable. Because the trial counsel claim was without merit, appellate counsel was not ineffective for failing to raise the claim on appeal.

mental health counselor at the Oklahoma County Jail." Pet. at 87-88. Ms. Wright's admittedly "limited" observations of Petitioner are detailed in a 2013 affidavit appended to his post-conviction application as Attachment 5 (hereinafter "Wright Affidavit"). The real focus of Petitioner's Ground Four, however, is a 2009 video recording (Pet'r's Attach. 16), which Ms. Wright could have sponsored into evidence. The video in question is a 21-minute interview of Petitioner conducted by the Federal Public Defender's Office for use in another death row inmate's clemency proceeding. Ms. Wright was present during the interview. Wright Affidavit at 2-3. Characterizing the video as "extremely valuable," "unique," "compelling," and "humanizing," Pet. at 88, 91, 94, Petitioner faults his trial counsel for not showing this video to his competency and resentencing juries. As for prejudice, Petitioner argues that the video would have made a difference in his competency proceeding because the jurors could have seen for themselves how "concrete" he is and how "he [can] only answer simple and direct questions." Id. at 94. Petitioner asserts that the video would have made a difference at his resentencing as well because it would have humanized him, showing the jury "a real person they were being asked to sentence to death." Id. at 95.

Applying Strickland, the OCCA analyzed Petitioner's claims and denied relief as follows:

> At Petitioner's competency trial, and later at his re-sentencing trial, his counsel presented a considerable amount of evidence relevant to Petitioner's mental functioning. Petitioner now points to two pieces of evidence that trial counsel had, but did not use at either proceeding. He claims this evidence could have been outcome-determinative. Because Petitioner did not raise this claim on direct appeal, it would be forfeited, but

for the fact that he alleges his direct-appeal counsel was ineffective in omitting it. 22 O.S.2011, § 1089(D)(4)(b).

Petitioner cites to several cases where we found error (though not always reversible error) when a trial court barred defense counsel from presenting certain mitigation evidence in a capital case. See Medlock v. State, 1994 OK CR 65, ¶¶ 42-43, 887 P.2d 1333, 1346; Mitchell v. State, 2006 OK CR 20, ¶¶ 55-57, 136 P.3d 671, 696-98. But Petitioner does not claim that the trial court barred him from presenting the evidence in question, at either the competency trial or the re-sentencing trial. Nor does he claim that trial counsel failed to uncover this information. In fact, as Petitioner concedes, trial counsel filed written notice concerning the potential use of this information in August 2009, well in advance of either proceeding. Petitioner merely claims that trial counsel made a fatal strategic error in deciding not to present this information, and that appellate counsel was ineffective for not raising this meritorious claim. We disagree.

When counsel has made an informed decision (i.e. after reasonable investigation) to pursue one strategy over another, that choice is virtually unchallengeable. Underwood v. State, 2011 OK CR 12, ¶ 82, 252 P.3d 221, 252 (quoting Strickland, 466 U.S. at 690-91, 104 S.Ct. at 2066). Trial counsel's decision not to present this or that piece of mitigation evidence may be sound trial strategy. Coddington, 2011 OK CR 21, ¶ 19, 259 P.3d at 839. Petitioner's lead counsel at the competency and re-sentencing trials was not only highly experienced in capital criminal defense; she was also quite familiar with the long and complicated history of Petitioner's case. Our assessment of the omitted materials does not show them to be of a character substantially different from the evidence that trial counsel ultimately chose to use.[FN5] We find no reasonable probability that raising this claim on direct appeal would have changed the outcome thereof. Therefore, appellate counsel was not ineffective for failing to include it.

> FN5. The evidence in question consists of (1) the proposed testimony of a counselor /investigator who interacted with Petitioner several times over the years, and (2) a video interview where Petitioner describes his feelings about a fellow inmate at Oklahoma State Penitentiary (which had been prepared for the fellow inmate's clemency hearing). The counselor's involvement with Petitioner, and her opinions about his mental functioning, were similar to the opinions of many other witnesses who testified at both the competency trial and the re-sentencing trial. However, this potential witness characterizes her interactions with Petitioner as "limited" in nature. Petitioner claims that the video interview would have

> corroborated witness accounts of his limited intellectual functioning and humanized him to the jury. Without substituting our judgment for that of the fact-finder, we believe the interview's persuasive force on that point is debatable.

Smith, No. PCD-2010-660, slip op. at 4, 9-10.

In his attempt to demonstrate unreasonableness, Petitioner's first contention is that the OCCA completely mischaracterized his claims. Petitioner challenges the OCCA's focus on strategy, claiming that he did not allege a strategic error, but an error "of *preparedness* and the failure to properly investigate and prepare on the part of both trial and appellate counsel." He points to his post-conviction application wherein he argued about the "'lack of *investigation and preparation*.'" Pet. at 89-90. However, in assessing whether counsel was deficient, strategy is a Strickland consideration. Strickland requires a defendant to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (citation omitted). Although Petitioner may have framed his claims in terms of a failure to investigate, the uncontested facts show otherwise. Petitioner's trial counsel knew about this evidence – about Ms. Wright *and* about the video. Before Petitioner was interviewed, trial counsel gave the Federal Public Defender's Office permission to interview him, and after the interview, the assistant federal public defender who conducted the interview contacted trial counsel about it. Thereafter, Ms. Wright spoke with trial counsel on two separate occasions, once when she dropped off the video at trial counsel's office and later in a telephone conversation. Wright Affidavit at 2-3. Trial counsel was not only aware of the evidence, but she even endorsed Ms. Wright as a witness for both the competency

proceeding and the resentencing. In her court filing, trial counsel gave the following

summary about Ms. Wright's testimony:

> Anna Wright, Investigator, Federal Public Defender, Oklahoma City. Ms. Wright, until very recently, was the psychiatric social worker at the Oklahoma County Jail. She became familiar with [Petitioner] when he was remanded for court in approximately 2003. At the time [Petitioner] came he had coloring books and pencils. Wright remembers being instructed to allow [Petitioner] to continue to keep them. Wright made sure [Petitioner] was safe and had his medications. As she quickly recognized that he was slow, she also wanted to make sure no one took advantage of him. Wright did not have great amounts of time to spend with [Petitioner], as inmates who are well behaved tend to get the least attention. [Petitioner] was very compliant, and very childlike in answers to questions she posed. [Petitioner] appears to Wright to be consistent with having an IQ of 55. Recently Anna Wright and a Federal Defender made a visit to [Petitioner] to interview him about a former cellie at DOC, Michael Delozier. The visit was a surprise to [Petitioner]. Interactions with him were filmed and saved onto a DVD. [Petitioner] did not understand the trial and appellate process; did not understand the concept of execution; did not understand in legal terms the help he was being asked to provide. In the end, Wright and the Federal Defender simply asked [Petitioner] what he would like to say about his former cellie. Wright will authenticate this DVD for the jury. Should it become an issue, Anna Wright is aware that [Petitioner] had trouble with an inmate who has profound mental illness. The inmate accused [Petitioner] of sexually assaulting him, but based on the traumatized behavior of [Petitioner], as well as the other inmate's history of abusing other inmates, staff at the jail were comfortable that [Petitioner] was not at fault. In fact this inmate is currently at the Oklahoma County Jail, on isolation, for having abused yet another inmate.

(O.R. XI, 2074-75). Trial counsel also listed the DVD as an exhibit, stating it "will be

provided to State once objectionable parts regarding death row are omitted" (id. at 2076).

Under these circumstances, Petitioner's assertion that the OCCA's opinion is flawed

because it failed to recognize the nature of his claims is undoubtedly without merit.

Next, Petitioner claims that the OCCA made no Strickland deficient performance

determination. He therefore seeks de novo review of this Strickland prong. Pet. at 90-91.

The Court does not agree. The OCCA's discussion of strategy was an assessment of trial counsel's performance under Strickland's first prong. AEDPA double deference is therefore due. See Jackson v. Warrior, 805 F.3d 940, 954 (10th Cir. 2015) ("Given that the standards of review under both Strickland and AEDPA are highly deferential, habeas review of ineffective assistance claims is doubly so.") (internal quotation marks and citation omitted), cert. denied, 137 S. Ct. 311 (2016).

Asserting that "[t]he deficient performance prong is easily met," Petitioner argues that trial counsel simply dropped the ball in failing to present Ms. Wright as a witness and introduce the video into evidence. His argument is that the video is of such great evidentiary value, there is no question that trial counsel was deficient for not presenting it. Pet. at 91. But trial counsel not only knew the evidence existed, but also what Ms. Wright could testify to and what the video would show. Since trial counsel was fully informed about the evidence, the OCCA's determination that trial counsel's decision not to present it fell within counsel's wide range of deference is not unreasonable. Petitioner has not overcome Strickland's strong presumption that counsel's actions amounted to a strategic decision.[20]

Although concluding that the OCCA reasonably denied relief on the deficient prong is enough to defeat Petitioner's Strickland claims, the Court additionally concludes that the

---

[20] Petitioner has provided an affidavit from his trial counsel dated April 21, 2015. Although Pinholster, 563 U.S. at 181, prohibits its consideration here, it is, in any event, no help to Petitioner's cause. In the affidavit, trial counsel simply states that she does not remember why she did not present this evidence. Pet'r's Attach. 17 at 2.

OCCA's prejudice determination survives AEDPA deference as well. The OCCA found that given the evidence which trial counsel did present, the omitted evidence was not outcome-determinative. Petitioner does not specifically challenge or even reference the case trial counsel did present at both his competency proceeding and resentencing, but only argues that the evidentiary quality of the video would have made a difference. The OCCA found that this argument was debatable, and the Court cannot disagree, especially in light of AEDPA deference. See Frost, 749 F.3d at 1225 ("Under the test, if all fairminded jurists would agree the state court decision was incorrect, then it was unreasonable and the habeas corpus writ should be granted. If, however, some fairminded jurists could possibly agree with the state court decision, then it was not unreasonable and the writ should be denied."); Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013) ("We may reverse only if all fairminded jurists would agree that the state court got it wrong.") (internal quotation marks omitted).

For the reasons set forth above, the Court concludes that Petitioner has failed to demonstrate his entitlement to relief on his fourth ground. Relief is therefore denied.

### E. Grounds Five and Six: Cruel and Unusual Punishment.

Petitioner's Grounds Five and Six are unexhausted claims which are easily disposed of on the merits. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."). In Ground Five, Petitioner asserts that because he is mentally ill, his execution would constitute cruel and unusual punishment under the Eighth Amendment, and in Ground Six, he argues that his rights under the Eighth

and Fourteenth Amendments would be violated if the State of Oklahoma is allowed to execute him for crimes he committed in 1993.

With respect to his Ground Five, Petitioner contends that mentally ill offenders should be categorically excluded from execution like mentally retarded offenders (Atkins) and juvenile offenders (Roper v. Simmons, 543 U.S. 551, 578 (2005)).

Given all of his alleged mental impairments (brain damage, mental retardation, and mental illness), Petitioner asserts that he is even more deserving of exclusion than the offenders in Atkins and Roper. Pet. at 98 (labeling his circumstance as "*Super* Atkins" or "Atkins *PLUS*").

Because neither Atkins nor Roper addresses the mentally ill offender, what Petitioner asks this Court to do is to extend their holdings and make new law which would prohibit the State from executing him. That is not the function of a habeas court. This Court has authority to entertain habeas applications from a state court prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The current state of the law is that it is cruel and unusual punishment to execute mentally retarded offenders and juvenile offenders. Petitioner is neither, and because the Supreme Court has not found mental illness to be a categorical exclusion, this Court has no authority to grant the relief he seeks.[21] See Lockett

---

[21] Although mental illness is not a categorical exclusion, "[t]he Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane." Ford v. Wainwright, 477 U.S. 399, 410 (1986). If a question of sanity exists at the time Petitioner's execution becomes imminent, Petitioner has an avenue for relief under Ford. See Herrera v. Collins, 506 U.S. 390, 406 (1993) ("the issue of sanity is properly considered in proximity to the execution").

v. Workman, No. CIV-03-734-F, 2011 WL 10843368, at *36-38 (W.D. Okla. Jan. 19, 2011) (denying the same claim due to lack of Supreme Court authority) (unpublished); Thacker v. Workman, No. 06-CV-0028-CVE-FHM, 2010 WL 3466707, at *23-24 (N.D. Okla. Sept. 2, 2010) (same) (unpublished).

In Ground Six, Petitioner asserts that because there has been an excessive delay between his crimes and the carrying out of his execution, "Oklahoma has forfeited its right to kill [him]." In support, Petitioner cites only a memorandum of Justice Stevens respecting the denial of certiorari in Lackey v. Texas, 514 U.S. 1045 (1995). Pet. at 99. This is clearly an insufficient demonstration of his entitlement to relief. See Mitchell v. Duckworth, No. CIV-11-429-F, 2016 WL 4033263, at *6-7 (W.D. Okla. July 27, 2016) (rejecting the same claim); Rojem v. Trammell, No. CIV-10-172-M, 2014 WL 4925512, at *3-5 (W.D. Okla. Sept. 30, 2014) (same).

For the foregoing reasons, Petitioner's Grounds Five and Six are hereby denied.

**F.     Ground Seven:     Cumulative Error.**

In his final ground, Petitioner urges relief upon a theory of cumulative error; however, where there is no error, there can be no cumulative error. Thacker v. Workman, 678 F.3d 820, 849 (10th Cir. 2012). Because the Court has found no errors in the grounds for relief raised by Petitioner, Ground Seven presents no avenue for relief and is hereby denied.

### III. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery as well as a motion for an evidentiary hearing. Docs. 20 and 38. For the following reasons, the Court finds that both should be denied.

In order to conduct discovery, Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts requires petitioner to show good cause. In <u>Bracy v. Gramley</u>, 520 U.S. 899, 908-09 (1997), the Supreme Court acknowledged that "good cause" requires a pleading of specific allegations showing a petitioner's entitlement to relief if the facts are fully developed.

In support of his request to conduct discovery, Petitioner argues that because there have been some instances in which Oklahoma County prosecutors have failed to comply with their obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), and <u>Napue v. Illinois</u>, 360 U.S. 264 (1959), he "is concerned prosecutors may not have disclosed important evidence in [his] case as well." Doc. 20 at 3-4. Accordingly, Petitioner requests permission from the Court to explore the State's files to see what he can uncover.

Overall, Petitioner's discovery motion lacks the specificity required by <u>Bracy</u>. While a few of his requests are more detailed than others, he fails to show how any of the information he seeks would entitle him to relief if fully developed. This is reason enough to deny his motion. But in addition, the Court notes that his first two requests for production (for all of the State's files and records and all of the law enforcement files and records related to his case), Doc. 20 at 6, are so broad and generic that they are best characterized as fishing expeditions which the Court will not permit. <u>Teti v. Bender</u>, 507 F.3d 50, 60

(1st Cir. 2007) ("A habeas proceeding is not a fishing expedition."); <u>Hill v. Johnson</u>, 210 F.3d 481, 487 (5th Cir. 2000) (noting that Rule 6 is not meant for fishing expeditions and that "factual allegations must be specific, as opposed to merely speculative or conclusory"). Petitioner's third request for production is akin to a fishing expedition, but is also vague and supported only by Petitioner's contention that he needs the information to try to explain "strange" things in his case. Doc. 20 at 5-6. This is clearly insufficient to warrant a grant of discovery.

Petitioner's fourth request for production (along with a related interrogatory) concerns State's witness Ruth Badillo, Assistant District Attorney Fern Smith, and the status of a life insurance policy on Petitioner's wife (State's Ex. 6). With reference to a 2001 evidentiary hearing conducted by the Court in Petitioner's prior habeas case, Petitioner questions whether Ms. Smith knew that he believed the policy had lapsed thereby negating a motive for his wife's murder.[22] Doc. 20 at 4-5. Although Petitioner asserts that "[m]ore information is needed" on this issue, <u>id.</u> at 5, a review of Petitioner's prior habeas case reveals that this matter was explored therein. Included with Petitioner's prior petition was an affidavit from Ms. Badillo dated November 5, 1998. Appendix at 45-48, <u>Smith</u>, No. CIV-98-601-R, Doc. No. 36 (Jan. 6, 1999). While acknowledging that the information contained in the affidavit was concealed by the prosecution, prior habeas counsel claimed that the evidence was nevertheless discoverable by trial counsel. Petition at 50, <u>Smith</u>,

_____

[22] Although Petitioner also asserts that Ms. Badillo has "brain and memory problems [that] were left undiscovered but need exploration," Petitioner offers no further explanation as to why this is relevant. Doc. 20 at 5.

No. CIV-98-601-R, Doc. No. 35 (Jan. 6, 1999). Both Ms. Badillo and Ms. Smith testified at the evidentiary hearing, and following the hearing, the Court concluded that trial counsel was not ineffective with respect to this evidence. Memorandum Opinion at 13-14, Smith, No. CIV-98-601-R, Doc. No. 168 (Jan. 10, 2002). Petitioner has not shown good cause for why this matter should be revisited.

Petitioner's final discovery request (fifth request for production and two related interrogatories) concerns Dr. John Call. Related to his Ground One, Petitioner seeks any and all information the State has on Dr. Call, including his "use and disuse" of the Blackwell Memory Test and whether he provided any legal services to the State in his case (beyond his expert services). Doc. 20 at 4, 6-7. Although the OCCA has previously questioned Dr. Call's use of the Blackwell Memory Test, and although Dr. Call did administer this test to Petitioner as a part of his evaluation, Pet'r's Attachs. 8 and 9, no evidence about the test was admitted in Petitioner's mental retardation trial. See Smith, No. O-2006-683, slip op. at 15-16 ("Both sides agree that no evidence was presented to the jury concerning Dr. Call's Blackwell Memory Test."). Petitioner's Ground One is a challenge to the jury's verdict, but because the jury did not hear any evidence related to the Blackwell Memory Test, Petitioner has not shown good cause to warrant further exploration of the issue. And as for the services Dr. Call provided the State, Petitioner has made absolutely no argument as to how such information would support a claim for relief and therefore discovery is denied on this basis.

Petitioner's request for an evidentiary hearing is likewise denied. Petitioner requests that he be given an evidentiary hearing on his Grounds One, Three, Four, and Five.

However, Petitioner's Grounds One, Three, and Four have all been denied by the Court on the merits because Petitioner has failed to show that the OCCA rendered unreasonable determinations of law or fact under Section 2254(d). In adjudicating these claims, the Court has noted that in accordance with <u>Pinholster</u>, 563 U.S. at 163, its review is limited to the record that was before the OCCA at the time it rendered its decision. Having failed to satisfy Section 2254(d), Petitioner is not entitled to an evidentiary hearing on these claims. <u>Jones v. Warrior</u>, 805 F.3d 1213, 1222 (10th Cir. 2015). As for Ground Five, the Court has addressed the merits of this claim de novo and denied relief due to the absence of Supreme Court authority. Because Petitioner's Ground Five is easily disposed of on the record, an evidentiary hearing is unwarranted on this ground as well. <u>See</u> <u>Anderson v. Attorney General of Kansas</u>, 425 F.3d 853, 859 (10th Cir. 2005).

## IV. Conclusion.

Having rejected all of Petitioner's grounds for relief, his petition for writ of habeas corpus is **DENIED**, along with his requests for discovery and an evidentiary hearing. Docs. 18, 20 and 38. Judgment will enter accordingly.

IT IS SO ORDERED this 13th day of July, 2017.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE